**REESE LLP**
Michael R. Reese
*mreese@reesellp.com*
George V. Granade
*ggranade@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York  10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

**TYCKO & ZAVAREEI LLP**
Jeffrey D. Kaliel
*jkaliel@tzlegal.com*
2000 L Street, Northwest, Suite 808
Washington, District of Columbia  20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

**KOPELOWITZ OSTROW P.A.**
Jeff Ostrow
*ostrow@kolawyers.com*
1 West Las Olas Boulevard, 5th Floor
Fort Lauderdale, Florida  33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300

*Counsel for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRETT SHEIB, *individually and on behalf of all others similarly situated*, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| – against – | **Demand for Jury Trial** |
| JPMORGAN CHASE & CO., | |
| Defendant. | |

Plaintiff Brett Sheib ("Plaintiff"), individually and on behalf of all others similarly situated, through his undersigned counsel, alleges the following based on personal knowledge as to allegations regarding Plaintiff and on information and belief as to all other allegations.

## INTRODUCTION

1.     This is a proposed class action seeking monetary damages, restitution, injunctive relief, and declaratory relief from Defendant JPMorgan Chase & Co. ("Defendant," "JPMorgan Chase," or the "Bank"), arising from its unfair and unconscionable practices of automatically creating debit cards for inmates released from Federal prisons (the "Releasees"), placing all Releasee funds on the debit cards, then making it impossible for Releasees to fully consume all of the funds placed on those debit cards—all without an iota of consent from the Releasees.

2.     While in Federal custody, prisoners may earn money at the rate of 17 cents an hour. They may also receive funds from friends or family members. Such funds are placed in an account for the inmate's use at a prison commissary, for phone or communications charges, and for other purposes.

3.     Upon release, each Releasee is entitled to all unused funds in the account.

4.     Also upon release, inmates have monies returned to them that they may have had in their possession at the time of arrest.

5.     All funds given to Releasees upon release are fully the property of the Releasees and are in no way a government benefit or government payment. Releasees are entitled to the unhindered possession of the funds upon their release.

6.     Without their consent, all Releasees have their funds returned to them on JPMorgan Chase debit cards. That is because JPMorgan Chase is the exclusive provider of funds disbursement services to Releasees—a role it won in a secretive, no-bid process through which it

entered into a contract with the Federal Bureau of Prisons.

7.     Under the so-called "U.S. Debit Card" program, JPMorgan Chase provides disbursement services to Releasees and others receiving funds held by the Federal government. JPMorgan Chase charges uniform fees to all holders of cards under the U.S. Debit Card program. Recipients cannot choose to opt out of participation in the program if they want to receive their funds.

8.     Upon release from prison, a federal inmate has a packet of information thrust into his or her hands. A JPMorgan Chase debit card loaded with the prisoner's prison account balance is one part of the packet. Releasees—newly provided their freedom—have no choice whatsoever how they are to receive their funds; do not enter into a contractual relationship for receipt of a debit card; and indeed do not willingly agree to enter into any relationship whatsoever with JPMorgan Chase.

9.     Indeed, if a Releasee refuses the packet of information thrust into his or her hands by a prison guard upon release, the Releasee will have no access whatsoever to his or her money.

10.     While free from Federal prison, Releasees remain captive to JPMorgan Chase. Once a Releasee is locked in to a JPMorgan Chase debit card, he or she is then assessed unconscionable and unusual bank fees for use (or non-use) of the card. As discussed below, some of those fees are designed to prevent Releasees from accessing all funds on a debit card. Indeed, by making it prohibitively expensive to receive an over the counter cash withdrawal from, or to receive a check drawn upon, the debit card, JPMorgan Chase ensures a "rump" balance will be left on each debit card—and forfeited to JPMorgan Chase.

11.     JP Morgan Chase's bank fees are often charged to persons who can afford them the least as they attempt to re-establish life in society.

12.     In 2014 alone, JPMorgan Chase took in several million dollars in bank fees charged to Releasees.

13.     The fees include $1.50 monthly charges for non-use of the card; fees for usage of non-JPMorgan Chase ATMs in an amount of $5 or more; a $10 charge simply for entering a JPMorgan Chase branch to ask for debit card funds to be converted to cash; and, remarkably, a $0.25 fee for not having enough money in the account to pay for a "declined" debit card purchase.

14.     These fees are themselves unconscionable and unusual in the banking industry. No reasonable consumer would agree to them as a condition of getting access to their own funds.

15.     The amounts of the fees are especially devastating to Releasees. At 17 cents an hour, a $1.50 non-use fee amounts to almost 10 hours of prison labor and a $5 ATM usage fee amounts to almost 30 hours of prison labor. As Releasees attempt to begin new lives outside of prison, these funds are very precious indeed.

16.     Moreover, and as occurred with Plaintiff, JPMorgan Chase's fee schedule prevents Releasees from fully "using up" the funds placed on the debit cards. Balances under $20 are not retrievable at an ATM. And an in-person withdrawal at a JPMorgan Chase branch costs $10, making it impossible to retrieve a remaining balance under that amount. Moreover, JPMorgan Chase provides no indication anywhere in the debit card documentation, website, or other materials that a check refund of the remaining balance is even a possibility.  When offered, check issuance costs a stunning $15.

17.     In short, JPMorgan Chase expects and intends that Releasees will forfeit remaining balances to the Bank because the Bank makes it difficult or impossible to retrieve the remaining balances.

18.     That is precisely what happened to Plaintiff, who was released from Federal prison almost two years ago and who has had a remaining and inaccessible balance of $10.53 on his debit card for nearly that long.

19.     Plaintiff, individually and on behalf of all others similarly situated, seeks to put a halt to Defendant's unfair, unconscionable, and deceptive acts and practices and seeks to recover from Defendant all monies it obtained through its unfair, unconscionable and deceptive conduct.

## THE PARTIES

20.     Plaintiff Brett Sheib is a citizen of the State of Florida who resides in Davie, Florida.

21.     Defendant JPMorgan Chase & Co. is a major American bank and is a citizen of the State of New York. JPMorgan Chase is a national banking association with headquarters in New York, New York, and assets of $2.6 trillion.

## JURISDICTION AND VENUE

### Jurisdiction

22.     This Court has original subject matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28 of the *United States Code*), under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). Because Plaintiff is a citizen of the State of Florida and Defendant is a citizen the State of New York, at least one member of the plaintiff class is a citizen of a State different from Defendant. Further, Plaintiff alleges the matter

in controversy is well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs. Finally, Plaintiff alleges "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

23.     This Court has personal jurisdiction over Defendant for reasons including but not limited to the following: Defendant maintains its headquarters in the State of New York and members of the proposed class reside within this District.

**Venue**

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant conducts business within this District and members of the proposed class reside within this District.

## CLASS ALLEGATIONS

25.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of himself and a Nationwide Class of similarly situated persons defined as follows:

> **The Nationwide Class.** All Releasees from Federal prison in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred bank fees on a JPMorgan Chase debit card or currently have an unused balance on a JPMorgan Chase debit card under $20.

26.     Additionally, pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of himself and a Multi-State Class of similarly situated persons defined as follows:

> **The Multi-State Class.** All Releasees from Federal prison in the United States, except for the State of Iowa, who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred bank fees on a JPMorgan Chase debit card or currently have an unused balance on a JPMorgan Chase debit card under $20.

27.     Together, the Nationwide Class and the Multi-State Class are the "Class" or the "Classes."

28.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

29.     Excluded from the Class is Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

30.     <u>Numerosity</u>. The members of the Class are so numerous that joinder is impractical. The Classes consist of thousands of members, the identity of whom is within the knowledge of Defendant and can be ascertained only by resort to Defendant's records.

31.     <u>Typicality</u>. The representative Plaintiff's claims are typical of the claims of the Class in that the representative Plaintiff, like all Class members, was defaulted into using a JPMorgan Chase debit card and then prevented from accessing the full amount of his personal funds without interference, obstacles, and fees.  The representative Plaintiff, like all Class members, has been damaged by Defendant's misconduct in that he has been forced to use a JPMorgan Chase debit card to access his own funds and has been assessed, has been prevented from fully accessing all funds, and/or will continue to be assessed unfair and unconscionable bank fees. Furthermore, the factual basis of Defendant's misconduct is common to all Class members and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

32.     <u>Commonality and Predominance</u>. There are numerous questions of law and fact common to the Class, and those common questions predominate over any questions affecting

only individual Class members. Among the questions of law and fact common to the Classes are whether Defendant:

    a.    automatically opens debit card accounts for Releasees without consent;

    b.    imposes contractual forms upon Releasees, without providing Releasees with the meaningful ability to review or approve the terms of those contracts;

    c.    deceives Releasees about, and does not adequately disclose, ATM fees by, among other things, charging, in effect, two service fees for every non-JPMorgan Chase ATM withdrawal;

    d.    forces persons to forfeit unused balances on debit cards;

    e.    converts money belonging to Plaintiff and the other members of the Classes through its policies and practices;

    f.    is unjustly enriched through its policies and practices; and

    g.    violates the consumer protection acts of various states through its policies and practices.

33.    Additional questions of law and fact common to the Classes include:

    a.    the proper method or methods by which to measure damages; and

    b.    the declaratory relief to which the Classes are entitled.

34.    <u>Adequacy of representation</u>. Plaintiff's claims are typical of the claims of the other Class members, in that they arise out of Defendant's same wrongful policies and practices. Plaintiff has suffered the harm alleged herein and has no interests antagonistic to the interests of the other Class members. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. For these reasons, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

35.     <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, no Class member could afford to seek legal redress individually for the claims alleged herein. Consequently, absent a class action, the Class members will continue to suffer losses and Defendant's misconduct will proceed without remedy.

36.     Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of economies of scale and of adjudication and comprehensive supervision by a single court.

## **COMMON FACTUAL ALLEGATIONS**

### I.     **BACKGROUND**

37.     In Federal prisons, JPMorgan Chase issues debit cards to inmates when they are released that contain the balances remaining in their prison accounts. The accounts are funded with both contributions from inmates' friends and family and with monies the inmates earned for work in prison, as well as monies in the possession of inmates at the time of their arrest.

38.     Released inmates have no choice but to accept the JPMorgan Chase debit cards, as the prisons foist the cards upon the Releasees on their way out, and the cards are the only means by which a Releasee can receive funds that he or she owns and has a right to possess,

unencumbered—money earned, often times, at the rate of 17 cents an hour in prison jobs.

39.     No contract is created between Releasees and JPMorgan Chase at the time of release. The inmate is handed minimal information without explanation or an opportunity to agree or disagree.

40.     JPMorgan Chase has a (literally) captive market and exploits its unfettered power to gouge Releasees—just at the moment they begin their attempt to reintegrate into society.

41.     Releasees later discover that Defendant charges them fees for accessing their own *or for failing to access their money quickly enough* for Defendant's liking. Releasees also discover they are forced to forfeit remaining balances on debit cards that they cannot use.

42.     Not only does JPMorgan Chase have contractual basis for assessing *any* fees, but the fees it does assess are excessive and unconscionable. For example, unless a Releasee can locate a JPMorgan Chase ATM, JPMorgan Chase charges *two separate ATM withdrawal fees for each ATM withdrawal*: a $2.00 fee for itself and a fee of $2.50 to $4 for use of the non-JPMorgan Chase ATM. Shockingly, a Releasee thus faces a $5.00 charge or more to make a single ATM withdrawal if he or she cannot locate a Chase ATM.

43.     Even after JPMorgan Chase issues the debit card, JPMorgan Chase does everything it can to keep Releasees locked into the debit card. For example, JPMorgan Chase makes it cost-prohibitive for a Releasee to receive his or her funds in cash, even after release. Indeed, if a Releasee simply walks in to a JPMorgan Chase branch and asks for the branch to provide the funds on his debit card to him in cash, JPMorgan Chase will charge an astounding $10.00 for that "privilege."

44.     The $10.00 cash conversion fee exists solely to disincentivize Releasees from receiving their funds in cash and to force Releasees to use the JPMorgan Chase debit card issued to them without their consent.

45.     Market surveys indicate that such cash withdrawal fees are unheard of in the debit card market.  For example, *another Chase debit card product* offered on the open market, Chase Liquid, provides this same service for *free*.  Direct Express does as well.  Wal-Mart and Western Union charge just $2.

46.     Similarly, JP Morgan Chase charges a shocking $15 for the issuance of a check for funds in an debit card account.  Chase's "Liquid" debit card charges just $8 for this service—and Western Union charges just $5.95 for check issuance.

47.     JPMorgan Chase has an obvious incentive to force Releasees to use its debit cards. Via payments network rules, JPMorgan Chase earns money every time an inmate uses a card for a debit card purchase or for an ATM withdrawal. To make sure Releasees use their debit cards in a way that makes money for the Bank, JPMorgan Chase makes it difficult for Releasees to remove their funds from their debit cards—either via an over the counter withdrawal or via a check.

48.     JPMorgan Chase also reaps significant fee income from forcing Releasees to use its debit cards. For example, it charges 45 cents merely to check a balance at an ATM, $1.50 if an account is inactive for 90 days, $7.50 to replace the card a second time within a year, and $0.25 for declined point-of-sale ("POS") transactions, and it charges for the use of non-JPMorgan Chase ATMs.

49.     Even small penalties can be both more significant—and more devastating—for newly-released prisoners, who may have less money and banking experience and who face many

other barriers to reintegrating into society.

50.     The harshness of the fee structure is designed to ensure that users will forfeit small, remaining balances to the Bank because of the difficulty or impossibility of retrieving them. This feature acts as another, hidden fee imposed on users of the JPMorgan Chase debit cards.

51.     Indeed, the under-use of balances is a well-known phenomenon in the similar gift-card industry. As much as $41 billion in gift-card value has gone unused since 2005, according to research firm TowerGroup, often due to the inability to "use up" remaining balances.

52.     Upon information and belief, the same phenomenon impacts the JP Morgan Chase's debit cards foisted upon Releasees—to JP Morgan Chase's great benefit.

53.     JPMorgan Chase's fee schedule prevents Releasees from fully "using up" the funds placed on their debit cards. Balances under $20.00 are not retrievable at an ATM. An in-person withdrawal at a Bank branch costs $10.00, making it impossible to retrieve a remaining balance under that amount. And the Bank provides no indication anywhere in the debit card documentation, website, or other materials that a check refund of the remaining balance is a possibility—and charges $15 for the right even when a debit card holder seeks a check.

## II.    JPMORGAN CHASE WINS THE RIGHT TO EXPLOIT RELEASEES THROUGH A NO-BID CONTRACT

54.     JPMorgan Chase won the right to force debit cards onto inmates released from Federal prisons when it signed a contract with the Federal Bureau of Prisons and the U.S. Department of the Treasury.

55.     The contract was <u>not</u> subject to an open, competitive bidding process.

56.     JPMorgan Chase's no-bid deal to issue debit cards for various Federal agencies began in 1998, was extended in 2008, and eventually expanded to include cards for Federal

prisons.

57.     Fees from Releasees make up most of the Bank's compensation for these cards, according to press reports.

58.     According to a 2013 U.S. Department of the Treasury document, the program under which JPMorgan Chase issues debit cards is called "U.S. Debit Card."

59.     JPMorgan Chase issues approximately 300,000 debit cards under U.S. Debit Card per year, including at least 50,000 cards to Releasees per year.

60.     The U.S. Debit Card program includes not just Releasees from Federal prison, but also FEMA volunteer payments and Federal employee transportation benefits. Upon information and belief, the same fee structure is used on all accounts.

61.     However, the Federal Bureau of Prisons prisoner release debit cards are the only cards that contain funds that are <u>not</u> a federal payment, but which are rightfully owned by the cardholder.

## III.   JPMORGAN CHASE DEBIT CARDS ARE FOISTED UPON RELEASEES WITHOUT CHOICE OR CONSENT

62.     When an inmate held a Federal prison operated by the Federal Bureau of Prisons is released, he or she is handed a debit card and a few sheets of information about the card.

63.     The debit card is funded with the amount in the inmate's prison account, which is made of funds from working or from gifts sent by friends and relatives on the outside.

64.     The inmate is given no choice whatsoever in how to receive his or her funds.

65.     Defendant does not provide any other options for Releasees to access their funds.

66.     Releasees are not given any opportunity to read or decline any of the materials. Releasees do not sign any acknowledgment that they have understood or read the materials. As a result, Releasees do not form valid contracts with JPMorgan Chase with respect to the debit

cards.

67.     Indeed, if the Releasees refuse the packets of information thrust into their hands by a prison guard upon release, the Releasees will have no access to their money.

68.     Moreover, the papers thrust into Releasees' hands are deceptive and misleading.

69.     At some prisons, the Releasee receives a one-page document entitled "Inmate Release Debit Card Information."  Exhibit 1.

70.     The sheet deceptively states the following:

> The cards can be used at ATM's and POS's (Point of Sale—any location that accepts Visa Card). No fee is charged at JPMorgan Chase ATM's and affiliates; if the ATM is not JPMorgan Chase or their affiliate any applicable ATM fees apply.

The sheet never informs Releasees that "applicable ATM fees" are *in addition* to a $2.00 ATM fee that JPMorgan Chase charges.

71.     The sheet also states that "[t]he card can be taken to a JPMorgan Chase bank and the funds withdrawn." ***The sheet does not inform Releasees that such a "service" will cost $10.00.***

72.     Releasees are also handed a Welcome to the U.S. Debit Card Program sheet. Exhibit 2.  That sheet states that "you can also use your card to withdraw cash at over one million ATMs anywhere, with surcharge-free access at Chase and partner ATMs (where applicable).  The sheet does not explain that non-network ATM withdrawals come with $4.50 or more in fees.

73.     The sheet states that "You may withdraw money from a teller at a Chase location[.]" ***The sheet does not inform Releasees that such a "service" will cost $10.00.***

74.     Releasees are also handed a Program Terms, Conditions and Disclosures document.  That document purports to contain a New York choice of law provision.  Exhibit 3.

75.    Releasees are handed a sheet with a debit card attached at the time of release (the "Debit Card Sheet").  Exhibit 4.

76.    The Debit Card Sheet touts prominently that "[the Releasee's] card can be used at Visa locations or any merchant or ATM that displays one of these logos," then shows Chase Allpoint, Plus, and Pulse Pay logos.

77.    While the cards "can be used" at ATMs with those logos, JPMorgan Chase does not inform Releasees that it charges an *additional* fee to do so at the ATMs that JPMorgan Chase does not considered to be "in network." Because the same Debit Card Sheet states that ATM withdrawals "On Us" are "FREE," JPMorgan Chase deceives Releasees into believing they may use all ATMs displaying an Allpoint, Plus, or Pulse Pay logo free of charge. In fact, upon information and belief, Releasees cannot do so.

78.    Nor does JPMorgan Chase provide a reasonable method for Releasees to determine the location and hours of free JPMorgan Chase ATMs.

79.    The Debit Card Sheet includes a fee schedule as follows:

### CARD FEE SCHEDULE

| TRANSACTION TYPE | FEE |
| --- | --- |
| ATM Withdrawal - On Us* | FREE |
| ATM Withdrawal - Domestic | 1 free per deposit; $2.00 each thereafter |
| ATM Withdrawal - International | $3.00 |
| ATM Balance Inquiry | $0.45 |
| Over-the-Counter (OTC) or Teller-assisted Withdrawal | $10.00 |
| Unlimited Point-of-Sale Access (POS) at all Visa Prepaid Card Retail Locations | FREE |
| Declined Point-of-Sale (POS) Transaction | $0.25 |
| Foreign Exchange Fee (for all international ATM withdrawals or POS transactions) | 3.50% |
| Inactivity Charge (after 90 consecutive days of no cardholder activity) | $1.50/month |
| Card Replacement - First per calendar year | FREE |
| Card Replacement Fee - Standard | $7.50 |
| Card Replacement Fee - Expedited (includes shipping) | $24.50 |

* ATM Owned by JPMorgan Chase or its Partner Networks

80.    The Debit Card Sheet commands Releasees to "**Activate your card right now! Log on to www.ucard.chase.com**."

81.     If a Releasee refuses to do so, he or she will have no access to his or her money.

82.     Releasees who find their way to www.ucard.chase.com are presented with the following screens, in order:



83.     Releasees are then provided with a screen that shows "UCard Terms and Conditions," as the following illustrates:



84.    Releasees must then validate their identities, as the following illustrates:



85.    The Terms and Conditions say nothing about the debit card itself or about fees associated with the debit cards. Rather, the Terms and Conditions govern use of the JPMorgan Chase website. (*See* Ex. 5 (attached hereto and fully incorporated herein).)

86.     If a Releasee does not accept the UCard Terms and Conditions, he or she cannot proceed and, consequently, cannot access his or her funds.

87.     The UCard Terms and Conditions is the only JPMorgan Chase contract to which Releasees even arguably assent—and that assent is under duress. The UCard website never requires users to assent to a fee schedule or any other agreement regarding use of the debit card.

88.     Because Releasees and JPMorgan Chase never formed valid contracts for the assessment of bank fees, JPMorgan Chase has no contractual authority to charge *any* fees to Releasees to access their own money. Nor does the Bank have any contractual authority to retain unused balances on debit cards.

89.     Yet JPMorgan Chase assessed myriad fees on the cards, as discussed herein, and holds unused funds on debit cards without affirmatively providing the funds to users.

90.     Indeed, the cards carry a variety of unconscionable and unusual fees that eat away at the small amount of money most former inmates are supposed to use to begin their new, post-prison lives.

91.     Had other options been available, Releasees could, and would, have chosen to deposit their funds into accounts that would not have come with the unconscionable and unusual fees Defendant charges and that would have come without the disincentives to full use of remaining debit card balances, as discussed herein.

92.     JPMorgan Chase has exploited a captive audience and charged Releasees unconscionable and unusual bank fees, and it has caused balances to be forfeited as a result of that power. The fees that Plaintiff and the Class members incurred, and/or the monies they effectively forfeited to JPMorgan Chase could not, and would not, have been charged if Plaintiff had not been automatically defaulted into a JPMorgan Chase debit card.

## IV.  THE FEES ARE EXCESSIVE AND DECEPTIVE

93.     Putting aside the fact that Chase had no right to assess <u>any</u> fees, the fees it did assess are excessive and deceptive.

94.     For example, Plaintiff could access his funds by making ATM withdrawals.

95.     The fee schedule states that Defendant charges a $2.00 "ATM Withdrawal—Domestic Fee."

96.     What the fee schedule *does not* disclose, however, is that the $2.00 fee is *in addition* to a fee charged for use of the ATM by the owner of the ATM.

97.     In actuality, Releasees are charged $4.50 or more for each ATM withdrawal they make from a non-JPMorgan Chase ATM—and JPMorgan Chase never discloses the double charging.

98.     Nowhere on the one-page sheet is there any suggestion that JPMorgan Chase will charge its own fee for the use of a non-JPMorgan Chase ATM.

99.     JPMorgan Chase states that the cardholder will have to pay only one fee for such a non-JPMorgan Chase ATM transaction.

100.     Charging the equivalent of non-JPMorgan Chase ATM transaction fees is not industry practice. Upon information and belief, the vast majority of U.S. banks do not charge a similar "out of network" fee.

101.     Similarly, the $10 in-person withdrawal fee is specifically designed to ensure Releasees do not exhaust the full balances in their accounts.

102.     Indeed, there will always be an excess balance that cannot be withdrawn from an ATM (because the balance is not at least $20.00) or that cannot be used at a point of sale.

103.     JPMorgan Chase disincentivizes Releasees from attempting to use *all* of the funds

on their accounts when it assesses a 25 cent declined POS transaction fee.

104.    All in all, the fee schedule that appears on the marketing documents, and many of the fees listed therein, is designed to dissuade Releasees from accessing funds in a manner other than the limited options JP Morgan Chase prefers—and to ensure that users will forfeit small, remaining balances to the Bank because of the difficulty or impossibility of retrieving all account funds.

105.    JPMorgan Chase counts on the fact that there will always be a remaining, unusable balance on the cards. In fact, JPMorgan Chase designs the card and fee structure so that this will always be the case. Because Releasees may not add further money to the cards, JPMorgan Chase knows it will normally be able to keep rump balances for itself, in the form of inactivity fees.

106.    By its use of inactivity fees, JPMorgan Chase makes unused balances revert to JPMorgan Chase. Ninety days after a Releasee's account balance becomes too low to withdraw from an ATM or in-person (due to the $10.00 fee), JPMorgan Chase begins assessing an inactivity fee of $1.50 per month until the account is fully depleted.

## V.    DEFENDANT'S UNCONSCIONABLE POLICIES AND PROVISIONS

107.    Defendant's policies and practices are, or were, unconscionable in the following respects, among others:

      a.    Defendant automatically opens debit card accounts on behalf of Releasees and deposits inmate funds into such accounts without consent;

      b.    Defendant imposes contractual forms upon cardholders without providing the meaningful ability to review or approve the terms of the contracts;

      c.    Defendant does not adequately disclose non-JPMorgan Chase ATM transaction fees;

d.      Defendant charges cardholders, in effect, two service fees for everyone non-JPMorgan Chase ATM withdrawal; and

e.      Defendant charges deceptive and unconscionable fees.

## VI.   DEFENDANT'S PRACTICES HARMED PLAINTIFF

108.    JPMorgan Chase's wrongful policies and practices described above harmed Plaintiff and the members of the Classes. The following allegations concerning Plaintiff illustrate the harm and damage that Plaintiff and the Class members sustained as a result of JPMorgan Chase's wrongful policies and practices.

109.    Plaintiff Sheib was released from Federal Prison Camp (FPC) Pensacola on May 23, 2014.

110.    At the time of his release, Plaintiff was handed a few sheets of paper and a JPMorgan Chase debit card.

111.    Shortly after his release, Plaintiff used the debit card for two small purchases, leaving a balance of $10.53 on his debit card.

112.    Plaintiff did not use his card after June 2014.

113.    As of May 2016, Defendant has provided no refund of the remaining balance and has not indicated anywhere, at any time, that a refund is a possibility. Consequently, Plaintiff has effectively forfeited the balance to the Bank.

114.    JPMorgan Chase is not authorized to continue to hold Plaintiff's money indefinitely.

## VII.   THE DAMAGES THAT PLAINTIFF AND THE CLASS MEMBERS SUSTAINED

115.   As a consequence of Defendant's policies and practices, Plaintiff and the Class members have been wrongfully forced to use JPMorgan Chase debit cards and to pay unconscionable, unusual, and deceptive bank fees and/or to effectively forfeit unused funds to Defendant. Defendant has improperly deprived Plaintiff and the Class members of funds, causing ascertainable monetary losses and damages.

116.   As a consequence of Defendant's improper fees and unused balance policies, Chase has wrongfully deprived Plaintiff and the Class members of funds to which it has no legitimate claim.

117.   All conditions precedent to the relief Plaintiff seeks herein have either occurred or have been performed or waived.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of the Classes)

118.   Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein, excepting those paragraphs that allege the existence of a valid contract.

119.   By means of Defendant's wrongful conduct alleged herein, Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and the members of the Classes. In so doing, Defendant acted with conscious disregard for the rights of Plaintiff and the members of the Classes.

120.   As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class members.

121.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

122.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to retain the benefits it received, and is still receiving, without justification, from the imposition of bank fees on debit cards in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

123.    The financial benefits Defendant derived rightfully belong to Plaintiff and the Class members. Defendant should be compelled to disgorge in a common fund, for the benefit of Plaintiff and the Class members, all wrongful or inequitable proceeds Defendant received. A constructive trust should be imposed upon all wrongful or inequitable sums Defendant received traceable to Plaintiff and the Class members.

124.    Plaintiff and the members of the Classes have no adequate remedy at law.

125.    Therefore, Plaintiff prays for relief as set forth below.

### SECOND CLAIM FOR RELIEF
#### Conversion
#### (On Behalf of the Classes)

126.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

127.    Defendant had, and continues to have, a duty to maintain and preserve debit cardholders' funds and to prevent their diminishment through its own wrongful acts.

128.    Defendant has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the Class members, without legal justification.

129.     Defendant continues to retain the funds unlawfully and without the consent of Plaintiff or the Class members.

130.     Defendant intends to permanently deprive Plaintiff and the Class members of the funds.

131.     Plaintiff and the Class members properly own the funds, not Defendant, who now claims it is entitled to their ownership, contrary to the rights of Plaintiff and the Class members.

132.     Plaintiff and the Class members are entitled to the immediate possession of the funds.

133.     Defendant has wrongfully converted the specific and readily identifiable funds.

134.     Defendant's wrongful conduct is continuing.

135.     As a direct and proximate result of Defendant's wrongful conversion of their funds, Plaintiff and the members of the Classes have suffered and continue to suffer damages.

136.     By reason of the foregoing, Plaintiff and the members of the Classes seek to recover from Defendant all damages and costs permitted by law, including all amounts that Defendant has wrongfully converted.

137.     Therefore, Plaintiff prays for relief as set forth below.

### THIRD CLAIM FOR RELIEF

### Violation of New York's Consumer Protection from Deceptive Acts and Practices Act, N.Y. GEN. BUS. LAW. § 349 *et seq.*
### New York General Business Law Section 349
### (On Behalf of the Classes)

138.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

139.     Plaintiff brings this claim on behalf of the Classes for violation of section 349 of New York's Consumer Protection from Deceptive Acts and Practices Act, N.Y. GEN. BUS. LAW

24

§ 349 *et seq.*

140.    Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]." N.Y. GEN. BUS. LAW § 349(a).

141.    As described herein, Defendant engaged, and continues to engage, in deceptive, unfair, and unconscionable acts and practices in violation of section 349 by automatically creating debit cards for Plaintiff and the Class members, placing all of Plaintiff's and the Class members' funds on the debit cards, and then making it impossible for Plaintiff and the Class members to fully consume all of the funds on the cards—all without Plaintiff's or the Class members' consent.

142.    Plaintiff and the Class members had no reasonable choice other than to go along with Defendant's conduct of forcing them to accept their funds on debit cards when they were released from Federal prison, and once the funds were on the debit cards, Plaintiff and the Class members had no reasonable option other than to pay the deceptive, unfair, and unconscionable fees Defendant charged, which prevented Plaintiff and the Class members from receiving all of their money upon their release from prison. Plaintiff and the Class members would not have accepted Defendant's debit cards if they had known it was impossible for them to receive the entirety of their funds via the debit cards.

143.    Plaintiff and the Class members were injured in fact and lost money as a result of Defendant's deceptive, unfair, and unconscionable acts and practices for all of the reasons set forth above, including but not limited to (i) because Plaintiff and the Class members were unable to recover the entirety of their money from Defendant's debit cards and, consequently, never had an opportunity to recover the entirety of their own money on their release from prison and (ii)

because Defendant charged Plaintiff and the Class members deceptive, unfair, and unconscionable fees for use of its debits as fully described above.

144.    By reason of the foregoing, Defendant's conduct, as alleged herein, constitutes deceptive acts and practices in violation of section 349, and Plaintiff and the Class members seek recovery of the actual damages they have suffered as a result of Defendant's actions. The amount of such damages is to be determined at trial, but will not be less than $50 per act. N.Y. GEN. BUS. LAW § 349(h).

145.    Plaintiff and the Class members seek to enjoin such unlawful, deceptive acts and practices described above. Each of the Class members will be irreparably harmed unless the Court enjoins Defendant's unlawful, deceptive, unfair, and unconscionable actions.

146.    Plaintiff and the Class members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Defendant from, *inter alia*, continuing to force Releasees to use its debit cards on release from Federal prison and continuing to charge deceptive, unfair, and unconscionable fees for use of the cards, and other relief allowable under section 349.

147.    Therefore, Plaintiff prays for relief as set forth below.

## FOURTH CLAIM FOR RELIEF

### Violation of the Consumer Protection Acts of 49 States and the District of Columbia
### (On Behalf of the Multi-State Class)

148.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

149.    Plaintiff brings this claim on behalf of the Multi-State Class for violation of the consumer protection acts of each of the States of the United States, except for the State of Iowa, and for violation of the consumer protection act of the District of Columbia.

150.   Plaintiff brings these statutory consumer protection claims pursuant to the substantially similar "Consumer Fraud Acts" identified below, all of which were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices. *See, e.g.*, Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (the "ICFA").

151.   The following consumer protection acts are collectively referred to herein as the "Consumer Fraud Acts":

a.     ALA. CODE § 8-19-1 *et seq.* (Alabama);

b.     ALASKA STAT. ANN. § 45.50.471 *et seq.* (Alaska);

c.     ARIZ. REV. STAT. ANN. § 44-1521 *et seq.* (Arizona);

d.     ARK. CODE ANN. § 4-88-101 *et seq.* (Arkansas);

e.     CAL. BUS. & PROF. CODE § 17200 *et seq.* and CAL. CIV. CODE § 1750 *et seq.* (California);

f.     COLO. REV. STAT. ANN. § 6-1-101 *et seq.* (Colorado);

g.     CONN. GEN. STAT. ANN. § 42-110a *et seq.* (Connecticut);

h.     DEL. CODE ANN. tit. 6, § 2511 *et seq.* (Delaware);

i.     D.C. CODE ANN. § 28-3901 *et seq.* (District of Columbia);

j.     FLA. STAT. ANN. § 501.201 *et seq.* (Florida);

k.     GA. CODE ANN. § 10-1-370 *et seq.* and GA. CODE ANN. § 10-1-390 *et seq.* (Georgia);

l.     HAW. REV. STAT. ANN. § 480-1 *et seq.* and HAW. REV. STAT. ANN. § 481A-1 *et seq.* (Hawai'i);

m.     IDAHO CODE ANN. § 48-601 *et seq.* (Idaho);

n.     815 ILCS 505/1 *et seq.* (Illinois);

o.     IND. CODE ANN. § 24-5-0.5-0.1 *et seq.* (Indiana);

p.     KAN. STAT. ANN. § 50-623 *et seq.* (Kansas);

q.     KY. REV. STAT. ANN. § 367.110 *et seq.* (Kentucky);

r.     LA. STAT. ANN. § 51:1401 *et seq.* (Louisiana);

s.     ME. REV. STAT. tit. 5, § 205-A *et seq.* (Maine);

t.     MD. CODE ANN., COM. LAW § 13-101 *et seq.* (Maryland);

u.     MASS. GEN. LAWS ANN. ch. 93A, § 1 *et seq.* (Massachusetts);

v.     MICH. COMP. LAWS ANN. § 445.901 *et seq.* (Michigan);

w.     MINN. STAT. ANN. § 325F.68 *et seq.*, MINN. STAT. ANN. § 325D.09 *et seq.*, MINN. STAT. ANN. § 325D.43 *et seq.*, and MINN. STAT. ANN. § 325F.67 (Minnesota);

x.     MISS. CODE ANN. § 75-24-1 *et seq.* (Mississippi);

y.     MO. ANN. STAT. § 407.010 *et seq.* (Missouri);

z.     MONT. CODE ANN. § 30-14-101 *et seq.* (Montana);

aa.     NEB. REV. STAT. ANN. § 59-1601 *et seq.* (Nebraska);

bb.     NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT. ANN. § 598.0903 *et seq.* (Nevada);

cc.     N.H. REV. STAT. ANN. § 358-A:1 *et seq.* (New Hampshire);

dd.     N.J. STAT. ANN. § 56:8-1 *et seq.* (New Jersey);

ee.     N.M. STAT. ANN. § 57-12-1 *et seq.* (New Mexico);

ff.     N.Y. GEN. BUS. LAW § 349 *et seq.* (New York);

gg.     N.C. GEN. STAT. ANN. § 75-1 *et seq.* (North Carolina);

hh.     N.D. CENT. CODE ANN. § 51-15-01 *et seq.* (North Dakota);

ii.     OHIO REV. CODE ANN. § 1345.01 *et seq.* (Ohio);

jj.     OKLA. STAT. ANN. tit. 15, § 751 *et seq.* (Oklahoma);

kk.    OR. REV. STAT. ANN. § 646.605 *et seq.* (Oregon);

ll.    73 PA. STAT. ANN. § 201-1 *et seq.* (Pennsylvania);

mm.    6 R.I. GEN. LAWS ANN. § 6-13.1-1 *et seq.* (Rhode Island);

nn.    S.C. CODE ANN. § 39-5-10 *et seq.* (South Carolina);

oo.    S.D. CODIFIED LAWS § 37-24-1 *et seq.* (South Dakota);

pp.    TENN. CODE ANN. § 47-18-101 *et seq.* (Tennessee);

qq.    TEX. BUS. & COM. CODE ANN. § 17.41 *et seq.* (Texas);

rr.    UTAH CODE ANN. § 13-11-1 *et seq.* (Utah);

ss.    VT. STAT. ANN. tit. 9, § 2451 *et seq.* (Vermont);

tt.    VA. CODE ANN. § 59.1-196 *et seq.* (Virginia);

uu.    WASH. REV. CODE ANN. § 19.86.010 *et seq.* (Washington);

vv.    W.VA. CODE ANN. § 46A-6-101 *et seq.* (West Virginia);

ww.    WIS. STAT. ANN. § 100.20 (Wisconsin); and

xx.    WYO. STAT. ANN. § 40-12-101 *et seq.* (Wyoming).

152.    Section 2 of the ICFA provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2 (footnotes omitted).

153.     Plaintiff and the Multi-State Class members have standing to assert claims under the Consumer Fraud Acts because they are consumers within the meaning of the Consumer Fraud Acts and Defendant's practices were addressed to the market generally and otherwise implicate consumer protection concerns. At all relevant times, Defendant conducted "trade and commerce" within the meaning of the Consumer Fraud Acts. *See, e.g.*, 815 ILCS 505/1(f).

154.     Defendant has committed unlawful, fraudulent, and/or unfair business acts and practices by engaging in the acts and practices alleged herein, including but not limited to automatically creating debit cards for Plaintiff and the Multi-State Class members, placing all of Plaintiff's and the Multi-State Class members' funds on the debit cards, and then making it impossible for Plaintiff and the Multi-State Class members to fully consume all of the funds on the cards—all without Plaintiff's or the Multi-State Class members' consent.

155.     Defendant intended that Plaintiff and the Multi-State Class members would rely on the unlawful, fraudulent, and/or unfair business acts and practices alleged herein.

156.     Defendant's actions, which were willful and wanton, constitute intentional violations of the Consumer Fraud Acts.

157.     Defendant's unlawful, fraudulent, and/or unfair business acts and practices described herein are continuing in nature and are widespread practices. Plaintiff and the Multi-State Class members have been damaged as a proximate result of Defendant's course of conduct and its violations of the Consumer Fraud Acts for all of the reasons set forth above, including but not limited to (i) because Plaintiff and the Multi-State Class members were unable to recover the entirety of their money from Defendant's debit cards and, consequently, never had an opportunity to recover the entirety of their own money on their release from prison and (ii) because Defendant charged Plaintiff and the Class members deceptive, unfair, and

unconscionable fees for use of its debits as fully described above.

158.     Plaintiff and the Multi-State Class members respectfully request damages, equitable monetary relief, injunctive relief, declaratory relief, and attorneys' fees, costs, and expenses to be assessed against Defendant, within the limits set forth by applicable law.

159.     Therefore, Plaintiff prays for relief as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, respectfully requests the Court to enter an Order:

A.       certifying the proposed Classes under Federal Rule of Civil Procedure 23, as set forth above;

B.       declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C.       declaring that Defendant has committed the violations of law alleged herein;

D.       providing for any and all injunctive relief the Court deems appropriate;

E.       awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

F.       providing for any and all equitable monetary relief the Court deems appropriate;

G.       awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

H.       awarding Plaintiff his reasonable costs and expenses of suit, including attorneys' fees;

I.        awarding pre- and post-judgment interest to the extent the law allows; and

**J.**       for such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all claims so triable.

Date: June 6, 2016                     Respectfully submitted,

**REESE LLP**

By: */s/ Michael R. Reese*
   Michael R. Reese
   *mreese@reesellp.com*
   George V. Granade
   *ggranade@reesellp.com*
   100 West 93rd Street, 16th Floor
   New York, New York  10025
   Telephone: (212) 643-0500
   Facsimile: (212) 253-4272

**TYCKO & ZAVAREEI LLP**
   Jeffrey D. Kaliel
   *jkaliel@tzlegal.com*
   2000 L Street, Northwest, Suite 808
   Washington, District of Columbia  20036
   Telephone: (202) 973-0900
   Facsimile: (202) 973-0950

**KOPELOWITZ OSTROW P.A.**
   Jeff Ostrow
   *ostrow@kolawyers.com*
   1 West Las Olas Boulevard, 5th Floor
   Fort Lauderdale, Florida  33301
   Telephone: (954) 525-4100
   Facsimile: (954) 525-4300

   *Counsel for Plaintiff and the Proposed Class*